# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JASON DOVER, ERIC SIMPSON, and STEVEN C. LEGGETT, individually and on behalf of all other similarly situated participants of the Yanfeng Automotive Interior Systems Savings and Investment 401(k) Plan, Yangfeng USA 401(k) Plan, Johnson Controls Injection Molding, LLC Savings and Investment 401(k) Plan, and Interior Savings and Investment 401(k) Plan, | Case No. 2:20-cv-11643-TGB-DRG<br>Hon. Terrence G. Berg<br>Mag. David R. Grand |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| YANFENG US AUTOMOTIVE INTERIOR SYSTEMS, I LLC; JOHNSON CONTROLS INJECTION MOLDING, LLC; YANGFENG US AUTOMOTIVE INTERIORS SYSTEMS LLC; ADIENT US LLC; BOARD OF DIRECTORS OF YANFENG US AUTOMOTIVE INTERIOR SYSTEMS, I LLC; BOARD OF DIRECTORS OF JOHNSON CONTROLS INJECTION MOLDING, LLC; BOARD OF DIRECTORS OF ADIENT US LLC; YANFENG GLOBAL AUTOMOTIVE INTERIOR SYSTEMS COMPANY LTD. EMPLOYEE BENEFITS POLICY COMMITTEE; YANFENG GLOBAL AUTOMOTIVE INTERIOR SYSTEMS COMPANY LTD. INVESTMENT COMMITTEE; ADIENT EMPLOYEE BENEFITS COMMITTEE; and JOHN DOES 1-50, | |
| Defendants. | |

## I. __INTRODUCTION__

1.      Plaintiffs Jason Dover, Eric Simpson, and Steven C. Leggett ("Plaintiffs"), by and through their attorneys, on behalf of the Yanfeng Automotive Interior Systems Savings and Investment 401(k) Plan ("Yanfeng Plan"), the Johnson Controls Injection Molding, LLC Savings and Investment 401(k) Plan ("Johnson Controls Plan"), and the Interior Savings and Investment 401(k) Plan (collectively, the "Plans"),[1] themselves, and all others similarly situated, allege as follows.

2.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include Yanfeng US Automotive Interior Systems I LLC ("Yanfeng" or the "Company"), Johnson Controls Injection Molding, Inc. ("Johnson Controls"), Adient US LLC ("Adient") (Johnson Controls, Adient and Yanfeng are the "Corporate Defendants"), the Board of Directors of Yanfeng ("Yangfeng Board"), the Board of Directors of Johnson Controls ("Johnson Board"), the Board of Directors of Adient ("Adient Board") (collectively, the Yanfeng, Johnson Controls and Adient Boards are the "Boards"), and their members

---

[1] The Johnson Controls Injection Molding, LLC Savings and Investment 401(k) Plan ("Johnson Controls Plan"), and the Interior Savings and Investment 401(k) Plan ("Adient Plan") are referenced jointly as the "Predecessor Plans". The Plans are legal entities that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the case law interpreting it, the relief sought in this action is for the benefit of the Plans, their participants, and beneficiaries.

during the Class Period (defined below), and the members of the Policy Committee, Benefits Committees and the Investment Committee (defined below) during the Class Period, for breaches of their fiduciary duties.

3.      Defined contribution retirement plans, like the Plans, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion was held in 401(k) plans**. *See* Godbout, Ted, *ICI: Retirement Assets Dropped 12% in Q1*, (June 23, 2020).[2]

4.      In a defined *contribution* plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).  Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

5.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.

---

[2]   Available   at:   https://www.napa-net.org/news-info/daily-news/ici-retirement-assets-dropped-12-q1 (last visited Oct. 29, 2020).

29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

6.     As of December 31, 2017, the Interior Savings and Investment (401k) Plan had more than $370 million in assets. Yanfeng Plan Form 5500 for 2017 filed with the U.S. Department of Labor[3], at Schedule H, at 2. As of December 31, 2018, the Yanfeng Plan had more than $343 million in assets. Yanfeng Form 5500 for 2018, at Schedule H, at 2. As of December 31, 2019, the Yanfeng Plan had more than $400 million in assets. Yanfeng Form 5500 for 2019, at Schedule H.

7.     At all relevant times, the Plans' assets have been entrusted to the care of the Plans' fiduciaries. The Plans' assets under management qualify it as a large plan in the defined contribution plan marketplace.[4] As large plans, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the

---

[3] Form 5500s filed with the U.S. Department of Labor are referenced individually hereinafter as "Form 5500" and collectively as "Form 5500s".

[4] Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

Plans' expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plans to ensure it was prudent.

8.      During the proposed Class Period (June 19, 2014 to the present) Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by: (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent in terms of cost; (2) failing to select the lowest cost share class for many of the funds within the Plans, despite their lower fees and superior returns; (3) selecting and retaining certain funds in the Plans despite the availability of similar investment options with lower costs and/or better performance histories; and (4) failing to ensure the Plans' total recordkeeping and other administrative expenses were reasonable and not excessive.

9.      The Plans' imprudent investment options during the Class Period include: (1) JPMorgan Smart Retirement® target date funds for 2020-2060; (2) Dodge & Cox Intl. Stock; (3) Janus Henderson Enterprise T; (4) Invesco Small Cap. Growth R5; (5) Wells Fargo Special Mid Cap Value Inst.; (6) PGIM High Yield Z; (7) Wells Fargo Special Small Cap. Val. Inst.; and (8) AB Global Bond A.

10.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of

5

prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

11.     Based on this misconduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

12.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

13.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place and where Defendants reside.

### III.   <u>STANDING</u>

15.    An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained below, the Plans suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

16.    Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent investment options in the Plans because Defendants' selection and retention of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

17.    Plaintiffs' individual accounts in the Plans were harmed because they invested in investment options that would have been removed from the Plans had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plans, resulting in a loss of retirement savings.

## IV.    PARTIES

### Plaintiffs

18.    Plaintiff Eric Simpson resides in Ooltewah, Tennessee. During his employment, from 2016 to 2020, Plaintiff Simpson participated in the Plans, including the Predecessor Plans, investing in certain options offered by the Plans, including:

- Fidelity Emerging Markets K

- Dodge & Cox International Stk Small Cap

- Wells Fargo SPL SM Cap Val IS

- Janus Henderson Enterprise T

- Wells Fargo SPL Mid CP Val Inst.

- Fidelity 500 Index

- Fidelity Low Priced Stk K

- Fidelity Mid Cap Idx

- Fidelity SM Cap Idx

8

- Fidelity Total Bond K6

- Vanguard Windsor II ADM

- Vanguard Primecap ADM

- JPMorgan SmartRetirement® 2035 R5

- JPMorgan SmartRetirement® Income R5

- Invesco Small cap Growth R5

- BTC LifePath Ret L

- BTC LifePath 2035 L

- BTC S&P 500 Index T

- BTC US Debt Index T

- Fidelity Fixed Income Fund

19.    Plaintiff Jason Dover resides in Macomb, Michigan. During his employment, Plaintiff Dover participated in the Plans, investing in the options offered by the Plans, including:

- Fidelity Emerging Markets K

- Dodge & Cox International Stk Small Cap

- Wells Fargo SPL SM Cap Val IS

- Janus Henderson Enterprise T

- Wells Fargo SPL Mid CP Value Inst.

- Fidelity 500 Index PR

- Fidelity Emerging Mkts K

- Fidelity Mid Cap Index

- Vanguard Windsor II Admiral

- Vanguard Primecap Admiral

- Fidelity Total Bond K6

20.     Plaintiff Steven C. Leggett resides in Macomb, Michigan. During his employment, Plaintiff Leggett participated in the Plans, investing in the options offered by the Plans, including:

- Fidelity 500 Index fund

- JPMorgan SmartRetirement® 2020 R5 fund

21.     As stated above, Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts either currently or as of the time their accounts were distributed, and the calculated value that the accounts should have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly-

10

sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

23.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments, because this information is solely within the possession of Defendants prior to discovery. Plaintiffs did not and could not review the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**<u>Defendants</u>**

**The Corporate Defendants**

24.     Defendant Yanfeng US Automotive Interior Systems I LLC ("Yanfeng" or the "Company"), which describes itself as "the world leader in automotive interiors,"[5] is the current Plan Sponsor and a Delaware Corporation with

---

[5] *See* Yanfeng's website at: https://www.yfai.com/

a principal place of business at 41319 West 12 Mile Road, Novi, Michigan, 48377. *See* 2018 Form 5500, at 1. According to the website for the Michigan Secretary of State, Yanfeng's registered agent for service is The Corporation Company.

25.     Defendant Johnson Controls, a corporation that maintains its principal offices in Milwaukee, Wisconsin, is a global, diversified technology and industrial company that entered into a joint venture with Yanfeng in May 2014.

26.     Defendant Johnson Controls was the sponsor, administrator, and a fiduciary of the Johnson Controls Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Johnson Controls was named as the previous Sponsor on the Form 5500 for 2015; (b) Johnson Controls is a named fiduciary under the Johnson Controls Plan; (c) during the Class Period, Johnson Controls exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets; and (d) it appointed Plan fiduciaries through the Johnson Controls Employee Benefits Policy Committee ("Johnson Controls Benefits Committee") and was responsible for monitoring those fiduciaries.

27.     Defendant Adient US LLC ("Adient") is a corporation that maintains its principal offices in Plymouth, Michigan. Defendant Adient became the sponsor, administrator, and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in or about December 2016, because: (a) Adient

was named as the Sponsor in the Interior Savings and Investment (401k) Plan Form 5500 for 2017; (b) Adient is a named fiduciary under the Plan; (c) during the Class Period, Adient exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets; and (d) Adient appointed Plan fiduciaries through the Adient Employee Benefits Policy Committee ("Adient Benefits Committee") (jointly with Johnson Controls Benefits Committee, "Benefits Committees") and was responsible for monitoring those fiduciaries. *See* Form 5500 for 2017.[6]

28.    Since January 1, 2018, Yanfeng has been the sponsor, administrator, and a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Yanfeng is named as the Sponsor on the  Interior Savings and Investment (401k) Plan Form 5500 for 2018; (b) Yanfeng is a named fiduciary under the Plan; (c) during the Class Period, Yanfeng exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets; and (d) it appointed Plan fiduciaries through the Yanfeng Global Automotive Interior Systems Company Ltd. Employee Benefits Policy Committee ("Policy Committee") and Investment Committee

---

[6] Defendants Yanfeng, Johnson Controls, and Adient are referred to herein as the "Corporate Defendants."

("Investment Committee") and was responsible for monitoring those fiduciaries. *See* Yanfeng Summary Plan Description dated January 1, 2019 ("SPD").

29.     Yanfeng has delegated certain administrative and investment related duties to two committees, the Policy Committee and the Investment Committee (jointly "the Yanfeng Committees").

30.     Johnson Controls delegated certain administrative and investment related duties to the Johnson Controls Benefits Committee.

31.     Adient delegated certain administrative and investment related duties to the Adient Employee Benefits Committee.

32.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

**The Board Defendants**

33.     Each member of the Yanfeng Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets. SPD at 33, 35, 53.

34.     Each member of the Johnson Controls Board during the putative Class Period (referred to herein as John Does 10-20) is/was a fiduciary of the Plan, within

the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets. SPD at 33, 35, 53.

35.     Each member of the Adient Board during the putative Class Period (referred to herein as John Does 20-30) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets. SPD at 33, 35, 53.[7]

36.     Accordingly, the Defendants acted through the Johnson Controls Board, Adient Board, and Yanfeng Board Defendants to perform the Company's Plan-related fiduciary functions. Among these functions was the power to appoint the members of the Committees, which in turn were vested with the power to delegate certain of their functions. *See*, *e.g.*, Yanfeng SPD at 12.

37.     These fiduciaries have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[7] The members of the Yangfeng, Johnson Controls, and Adient Boards are collectively referred to herein as the "Board Defendants."

**The Committee Defendants**

38.    As stated above, each of Yanfeng, Johnson Controls, and Adient delegates and/or have delegated certain administrative and investment related duties to their Committees.

39.    The members of the Policy Committee and the Investment Committee are named fiduciaries of the Yanfeng Plan. SPD at 11, 35.

40.    The Benefits Committees were named fiduciaries of the Predecessor Plans. Form 5500s for 2015-2017 (naming Benefits Committees as Plan Administrators).

41.    "As the ERISA Plan Administrator, the Policy Committee has the exclusive right, power, responsibility, and authority, in its sole and absolute discretion and to the full extent under ERISA and Internal Revenue Code (the "Code"), to administer, apply, construe, and interpret the Plan, to establish all rules and procedures to be followed by participants and beneficiaries under the Plan, to decide all matters and questions arising in connection with the Plan, and to take any other action it deems necessary and appropriate to administer and operate the Plan." Yanfeng SPD at 33.

42.    The Policy Committee also has discretion to change, modify or amend the Plan, or any portion of it at any time or for any reason. Yanfeng SPD at 33.

43.    The Yanfeng Plan provides the Policy Committee with the discretion to delegate its administrative duties and responsibilities to people or entities of its choice.

44.    The recordkeeper for the Plans has been, and is currently Fidelity Investments Institutional ("Fidelity").

45.    The Policy Committee specifically delegated many of the day-to-day operations of the Yanfeng Plan to its Recordkeeper Fidelity. Yanfeng SPD at 33.

46.    Upon information and belief, the Predecessor Plans provided the Benefits Committees with the discretion to delegate its administrative duties and responsibilities to people or entities of their choice.

47.    The Benefits Committees and each of their members were fiduciaries of the Predecessor Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

48.    The Policy Committee and each of its members were fiduciaries of the Yanfeng Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

49.     The Investment Committee "decides what investment options are available to [participants] under the Plan, and may eliminate, change, or add to the Plans' investment options at any time in its sole discretion." Yanfeng SPD at 11-12.

50.     The Investment Committee and each of its members were fiduciaries of the Yanfeng Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

51.     The Benefits Committees and Policy Committee and unnamed members of the Benefits and Policy Committees during the Class Period (referred to herein as John Does 30-40), are collectively referred to herein as the "Committee Defendants."

52.     The Investment Committee and unnamed members of the Investment Committee during the Class Period (referred to herein as John Does 40-45), are collectively referred to herein as the "Investment Committee Defendants."

**Additional John Doe Defendants**

53.     To the extent that there are additional officers and employees of Yanfeng, Johnson Controls, or Adient who are or were fiduciaries of the Plans during the Class Period, or were hired as investment managers for the Plans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join

them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 45-50 include, but are not limited to, Yanfeng, Johnson Controls, and Adient officers and employees who are or were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

54.     Fidelity, through its subsidiary Strategic Advisors LLC ("Strategic"), has been appointed by the Investment Committee to provide discretionary investment management to the Plans through Fidelity® Personalized Planning & Advice. Participant Fee Disclosure Notice, 2019, at 3.

## V.     **THE PLANS**

55.     "The Plan, formerly known as the Johnson Controls Injection Molding, LLC Savings and Investment 401(k) Plan, is a defined contribution plan adopted effective August 1, 2008 for participation by eligible employees of what was formerly Johnson Controls Injection Molding, LLC ("JCIM"). As of December 31, 2016, JCIM's business, including the Plan, was purchased by Adient US LLC [("Adient")]," and it was renamed the Interior Savings and Investment 401(k) ("Adient Plan")." Interior Savings and Investment 401(k) Plan, Form 5500 for 2017, Notes to Financial Statements at 5.

56.     As of January 1, 2018, the Adient Plan was amended and restated to reflect the merger of the Yanfeng USA 401(k) Plan with the Plan, to reflect the

addition of Yanfeng Automotive Trim Systems, Inc. as a participating employer, and to reflect the change in the name of the Plan from Interior Savings and Investment 401(k) Plan to Yanfeng Automotive Interior Systems Savings and Investment 401(k) Plan. In addition, on January 1, 2018, the Plan transferred its investments out of the Adient US LLC Defined Contribution Plans Master Trust (Master Trust), and Yanfeng Automotive Interior Systems, LLC became the Plan Sponsor." Yanfeng Automotive Interior Systems Savings and Investment 401(k) Plan, Form 5500 for 2018, Notes to Financial Statements, at 7.

57.    The Yanfeng Plan SPD states that the Yanfeng Plan is a profit-sharing plan that is intended to be qualified under section 401(a) of the Code, and includes a "cash or deferred arrangement" described in section 401(k) of the Code. SPD at 32. The Yanfeng SPD further states that the Company "sponsors the Plan to enable eligible participants to save for retirement through a combination of their own contributions and company contributions, if applicable." Yanfeng SPD at 3.

58.    Each of the Plans is/was a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each participant and benefits are based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be

allocated to such participant's account. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.

59.     According to the Yanfeng SPD, the Plan['s] assets are held in a trust that was created for the investment of the Plans' assets and is maintained by the Trustee, Fidelity Management Trust Company. SPD at 28; Form 5500 for 2018, at 11.

60.     The Policy Committee has delegated many of the day-to-day operations of the Yanfeng Plan to Fidelity, the Plans' Recordkeeper.

*Eligibility*

61.     The Yanfeng Plan covers six eligible groups of employees, which are defined in Appendices A-C and E-G of the SPD. SPD at 3-4. The six categories are:

- Salaried and non-union hourly employees of Yanfeng US Automotive Interior Systems II LLC who were most recently hired prior to July 1, 2017. (**Appendix A**)

- Employees of a Participating Employer who are members of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW). (**Appendix B**)

- Employees of Yanfeng US Automotive Interior Systems II LLC who are employed at the Bryan, Ohio location and are members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW) AFL-CIOCLC and its Local Union 141. (**Appendix C**)

- Salaried, non-union hourly and union hourly employees (if their collective bargaining agreement calls for participation in the Plan) of Yanfeng US

Automotive Interior Systems I LLC who were most recently hired prior to July 1, 2017 and are not included in another eligible group. (**Appendix E**)

- Employees of Yanfeng US Automotive Interior Systems I LLC who are employed at the highland Park, Michigan location and are members of United Automobile Workers, Local 400. (**Appendix F**)

- Salaried, non-union hourly and union hourly employees (if their collective bargaining agreement calls for participation in the Plan) of (1) Yanfeng US Automotive Interior Systems I LLC who are employed at the Fountain Inn location or the Belvidere location, (2) Yanfeng USA Automotive Trim Systems, Inc, and (3) Yanfeng US Automotive Interior Systems I LLC and Yanfeng US Automotive Interior Systems II LLC who were most recently hired on or after July 1, 2017 and are not included in another eligible group. (**Appendix G**)

62.    Eligible employees are permitted to enroll immediately upon hire. Yanfeng SPD at 5.

63.    The Yanfeng Plan excludes (a) any member of a bargaining unit of employees covered by the Louisville collective bargaining agreement; (b) any employer classified as a "leased employee" or "independent contractor"; (c) foreign citizens on temporary assignment in the United States; or (d) employees who are eligible to participate in another 401(k) plan of a participating employer. Form for 5500 2018, Notes to Financial Statements.

64.    Years of Vesting Service "is calculated in years and monthly fractions, and equal the total of all periods of your employment with the Company and any of its affiliates." SPD at 14. The specific vesting schedules for each group of Participants is set forth in the corresponding appendix of the Yanfeng SPD.

65.    Under the Plan, Participants are 100 percent vested in their salary deferral contributions and any rollover account contributions, regardless of the length of service. Vesting in the Company's contributions, plus actual earnings thereon, is based on years of service. Participants vest in contributions made by the Company based on the schedules in the Plan Agreement, which vary by employee group and contribution type. Form 5500 for 2018 (Notes to Financial Statements, at 8). *See also* Yanfeng SPD, at Appendix E.

### *Contributions*

66.    The rules that govern Participants' contributions and Employer contributions for the Yanfeng Plan vary depending on the Group in which the Participant is eligible to participate. SPD at Appendices A-C, E-G.

67.    Participants in the Yanfeng Plan may contribute to their individual accounts by way of: (i) salary deferral contributions, on either pre-tax or after-tax basis; (ii) roll over amounts from other qualified benefit or defined contribution plans; and/or (iii) transfers from other retirement plans. *Id.* at 6.

68.    Generally, Participants may contribute an amount equal to not less than 1% of their compensation per pay period and which does not exceed either the limit set for each Eligibility Group or the limitations set by the Code. Participants direct the investment of their contributions into various investment options offered by the Plan.

### The Plans' Investments

69. Various funds were available to participants of the Plans for investment during the Class Period, including funds managed by Fidelity, JPMorgan, Vanguard, Dodge & Cox, Janus Henderson, Invesco, and Wells Fargo.

70. Defendants designated the JPMorgan SmartRetirement® target retirement date funds as the Qualified Default Investment Alternative ("QDIA") for the Yanfeng Plan. While a target date retirement fund may be an appropriate selection for a 401(k) Plans' QDIA, the JPMorgan SmartRetirement® target date funds were an imprudent selection due to the unreasonable expenses of this investment option (56-57 bps) and underperformance as compared to numerous less expensive alternative target date funds, as shown in the charts below.

71. A small percentage of the funds for the Yanfeng Plan were invested in the common collective trust managed by Fidelity Management Trust Company. In addition to the funds available for investment through the Yanfeng Plan, Participants had the ability to choose funds available through Fidelity Personalized Planning and Advice. Fidelity collected additional fees from Participants who used this advisory service. *Yanfeng Fee Disclosure*, at 5. However, the information provided about the additional fees in the Yanfeng Fee Disclosure is opaque, stating: "If you utilize this service, the advisory fee is estimated not to exceed 0.65% per year of your average daily managed account balance and is deducted quarterly." *Id.*

72.    According to the Plans' Form 5500s, the Plans' assets under management for all funds was: $245,390,336 as of December 31, 2015; $304,590,316 as of December 31, 2016; $370,723,050 as of December 31, 2017; $343,978,590 as of December 31, 2018, at $400,736,825 as of December 31, 2019. Form 5500s for 2015-2019, Schedule H and Form 5500 at Statement of Net Assets Available for Benefits for December 31, 2014 information.

73.    According to the Plans' most recently filed Form 5500, as of December 31, 2019 the Plans offered the following investment options to their participants and each fund listed below was entrusted with the stated amount by the Participants as of the date of the Form 5500 filing:

| **IVESTMENT OPTION** | **DECEMBER 2019 VALUE** |
| --- | --- |
| Fidelity 500 Index | $54,694,086 |
| Vanguard Primecap Adm. | $35,079,678 |
| JPMorgan SmartRetirement® 2030 R5 | $28,608,878 |
| JPMorgan SmartRetirement® 2035 R5 | $25,701,170 |
| JPMorgan SmartRetirement® 2025 R5 | $21,468,296 |
| JPMorgan SmartRetirement® 2040 R5 | $17,011,248 |
| JPMorgan SmartRetirement® 2045 R5 | $9,414,893 |
| JPMorgan SmartRetirement® 2020 R5 | $7,971,566 |
| JPMorgan SmartRetirement® 2050 R5 | $7,606,543 |
| JPMorgan SmartRetirement® 2055 R5 | $7,413,175 |
| JPMorgan SmartRetirement® 2060 R5 | $2,504,174 |
| Fidelity Mid Cap Index | $25,383,270 |
| Dodge & Cox International Stk. | $22,929,101 |
| Janus Henderson Enterprise T | $28,758,406 |
| Invesco Sm. Cap. Growth R5 | $17,662,528 |
| Fidelity Total Bond K6 | $14,571,711 |
| Wells Fargo SPL Mid Cap Val. Inst. | $10,661,404 |

| Prudential Funds PGIM High Yield Z | $8,711,539 |
| Vanguard Windsor II Adm | $6,426,908 |
| Wells Fargo Special Sm. Cap. Val Inst. | $4,485,221 |
| AB Global Bond A | $2,613,256 |
| Fidelity Emerging Mkts K | $4,142,990 |
| Fidelity Sm. Cap. Index | $2,329,463 |
| Fidelity Investments Money Market Gov't Inst. | $100,359 |
| Total mutual funds | $369,389,292 |
| Common collective trust<br>Fidelity Management Trust Company MIP CL 2 | $24,777,249 |

## VI.   CLASS ACTION ALLEGATIONS

74.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P.

23 on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the Plans,
> at any time between June 22, 2014 and the present (the "Class
> Period").

75.    The members of the Class are so numerous that joinder of all members

is impractical. According to the Form 5500 filed with the U.S. Department of Labor,

as of December 31, 2018, there were 8,446 Plan participants with account balances

at the beginning of the year. 2018 Form 5500, at 2.

76.    Plaintiffs' claims are typical of the claims of the members of the Class.

Like other Class members, Plaintiffs participated in the Plans and have suffered

injuries as a result of Defendants' mismanagement of the Plans. Defendants treated

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in
their motion for class certification or subsequent pleadings in this action.

Plaintiffs consistently with other Class members and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

77.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.    Whether Defendants are fiduciaries of the Plans;

      B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

      C.    Whether the Board Defendants failed to adequately monitor the Benefits Committees, Policy Committee, Investment Committee and the other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

      D.    The proper form of equitable and injunctive relief; and

      E.    The proper measure of monetary relief.

78.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

79.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A)

because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

80.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

81.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

82.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries  under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management  of  such  plan  or  exercises  any  authority  or  control  respecting

management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

83.     As described above, Defendants were fiduciaries of the Plans because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plans' assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plans; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plans.

84.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments, solely in the interest  of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

29

85.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).

86.    "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

87.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

30

88.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in  selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio."  *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at \*4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

89.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

31

90.     During the Class Period, Defendants did not act in the best interests of the Plans' participants. Investment fund options chosen for a plan should not favor the fund provider over the Plans' participants. Yet, here, to the detriment of the Plans and their participants and beneficiaries, the Plans' fiduciaries included and retained in the Plans numerous investment options that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plans.

91.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plans were being charged appropriate and reasonable fees for the Plans' investment options. Additionally, Defendants failed to leverage the size of the Plans to negotiate lower expense ratios for certain investment options maintained and/or added to the Plans during the Class Period.

92.     As discussed below, Defendants breached fiduciary duties to the Plans and their participants and beneficiaries and they are liable for their breaches and the breaches of their co- fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VIII.  <u>SPECIFIC ALLEGATIONS</u>

### A.     **Improper Management of an Employee Retirement Plan Can Cost the Plans' Participants Millions in Savings**

93.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial

consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

94.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. B). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[9]

95.    As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money

---

[9]    Available    at    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf    (last    visited Oct. 28, 2020).

that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

96.    The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.* (footnote omitted).

97.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[10] Although 401(k) accounts are fully funded at all times, that full-funding does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

98.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers," and "monitor investment

---

[10] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited Oct. 28, 2020).

options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*.

99.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[11] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

100.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place(s) funds in a given category based on their portfolio statistics and compositions over the past three years."[12]

---

[11] Available at https://www.ici.org/pdf/per23-04.pdf (last visited Oct. 28, 2020).
[12] Available at
http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited Oct. 28, 2020).

101.   On average, the expense ratios are lower for 401(k) participants than they are for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in significant competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

102.   This competition has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, expense ratios for 401(k) participants fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

103.   Industry analysts have recognized a marked trend toward lower fees in 401(k)s from 2012-2014. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, THE WALL STREET JOURNAL (May 15, 2016) (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

104.   The table below illustrates that 401(k) plans on average pay significantly lower fees than regular industry investors, even as expense ratios for all investors have declined.

FIGURE 7

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*The Economics of Providing 401(k) Plans*, at 12. Notably, this table does not take into account cost differences between passively managed funds that are designed to mirror the performance of a market index and actively managed funds that attempt to outperform the market with more aggressive investment strategies. Actively managed funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research, more frequent trades, and more frequent monitoring.

105. Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

37

### 1. Passively Managed Funds Cost Less Than Actively Managed Funds

106. Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotations and citations omitted). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496-97 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law.

107. Under the common law of trusts, the determination as to whether the selection of an investment is appropriate depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. B(1) (2012). The "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)" is among the relevant factors that fiduciaries should consider. *Id.*

108. Here, each investment option within the Plans charged certain fees that are paid by deductions from the pool of assets held by the Plans. For the Plans' passively managed funds, which are designed to track a market index like the Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because passively managed funds are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

38

109.   By contrast, the Plans' actively managed funds, which have a mix of securities selected by the fund manager based on his or her belief they will beat the market, incur higher fees to pay the fund managers and their associates for the work associated with stock picking. Often, these higher fees also pay for the fund's marketing and executive compensation, which provide no benefits to the Plans.

110.   While higher-cost mutual funds may outperform less-expensive passively managed index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in THE WASHINGTON POST, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a study of S&P Dow Jones Indices that analyzed 2,862 actively managed domestic stock mutual funds over a five-year period, found that "just two funds...managed to hold on to their berths in the top quarter every year for five years running. And for the 2,862 funds as a whole, that record is even a little worse than you would have expected from random chance alone."[13] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index Funds Trounce Actively Managed Funds: Study* (June 26, 2015) (reporting that data shows that "actively managed

---

[13]   Available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited Oct. 28, 2020).

funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[14]

111.   Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

112.   Here, the Plans have been dominated by expensive, actively managed funds. Out of the 25 current investment options, the Plans presently include only 4 lower-cost passively managed index funds (Fidelity 500 Index (FXAIX), Fidelity Mid Capital Index (FSMDX), Fidelity Total Bond K6 (FTKFX), and Fidelity Small Cap Index (FSSNX)).

113.   As shown in the performance chart below, the Committees' decision to select mostly actively managed funds was a poor choice for the Plans because despite their high expenses, the actively managed funds rarely, if ever, performed any better than far less expensive passively managed index funds.

---

[14]   Available at https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited Oct. 28, 2020).

## 2.   Institutional Share Classes Cost Less Than Investor Share Classes

114.   Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

115.   Large defined contribution plans such as the Plans have sufficient assets to qualify for the lowest cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options. Thus, a fiduciary to large defined contribution plans such as the Plans can use their asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

116.   The availability of lower-cost institutional class shares for large defined benefit plans has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure

41

to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016).[15]

117.   Indeed, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved … in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble*, 575 U.S. 523 *Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

118.   As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly

---

[15]   Available at: https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited Oct. 28, 2020).

fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011).[16]

119. Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plans.

### 3. Collective Trusts and Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts

120. Throughout the Class Period, the investment options offered within the Plans and offered to the participants were mostly pooled investment products known as mutual funds.

121. Plan fiduciaries such as Defendants must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further than mutual funds and provide lower fee alternatives than even institutional and 401(k) plan specific shares of mutual funds. Trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments. Restatement (Third) of Trusts § 100 cmt. B(1) (2012).

---

[16] Available at: https://www.plansponsor.com/magazine/class-ifying-mutual-funds/ (last visited Oct. 28, 2020).

122.   Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot either advertise or issue formal prospectuses. As a result, their costs are significantly lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, *Not Your Normal Nest Egg*, THE WALL STREET JOURNAL, March 2013.

123.   Due to their potential to reduce overall plan costs, collective trusts have become widely popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds). Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014).[17]

124.   The criticisms leveled against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts can track the daily

---

[17] Available at https://www.ici.org/pubs/research/reports (last visited Oct. 28, 2020).

performance of their investments online. *See* Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, Employee Benefit News (Apr. 14, 2016) (herein, "CITs Gaining Ground").[18] Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Id*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors. Also, collective trusts are subject to state and federal banking regulations that provide comparable protections. American Bankers Association, *ABA Primer on Bank Collective Funds*, at 1 (June 2015).[19]

125.   Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

126.   Although the Plans' investments included one collective trust managed by Fidelity beginning in 2018, this investment represented less than 7% of the Plans'

---

[18]   Available at https://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (last visited Oct. 28, 2020).
[19]   Available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds (last visited Oct. 28, 2020).

assets and the Plans did not have a single collective trust option for the years 2015-2017.[20]

127.   Because of the Plans' size, they could have reaped considerable cost savings by using collective trusts earlier in the Class Period and more extensively in the later years, but Defendants again failed to exercise their duty of care.

128.   Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

129.   Separate accounts are widely available to large plans such as the Plans, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998) (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses

---

[20] *See* Forms 5500 for 2018 and 2019, at Schedule H, page 16. The Form 5500 for each of 2015-2017 show that no Plan assets were invested in collective trusts during those years. *See* Form 5500 for 2015, at Schedule H; Form 5500 for 2016, at Schedule H; Form 5500 for 2017, at Schedule H.

can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").[21]

130.   The Plan does not offer separate accounts currently. *See* Form 5500s for 2015-2019 at Schedule H.

## B.   Defendants Breached Their Fiduciary Duties by Retaining Conflicted Investment Advisors and Consultants

131.   The Company's most recent 5500s list consultants or investment advisors retained by Yanfeng in 2018 and 2019, and the amounts of compensation paid by Yanfeng. Specifically, Yanfeng paid Strategic Advisors, Inc. ("SAI") $41,879 and $76,730 in 2018 and 2019, respectively, and Yanfeng paid Stifel Pearl Street Investment Management ("Stifel Pearl Street") $90,524 and $75,000 in 2018 and 2019, respectively. *See* 2018 and 2019 Form 5500s, Schedule C at 3.

132.   The selection and retention of the investment consultant is one of most import fiduciary duties of a 401(k) committee. Tim Jenkinson, *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, Journal of Finance (Sept. 2014) ("As it is, plan sponsors are making appointments partly uninformed, and some may be naïve about the actual ability of consultants' recommendations.").

---

[21]Available at:
https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (last visited Oct. 28, 2020).

133.    Based on SEC documents, both Strategic Investment Advisors and Stifel Pearl Street are dual-registered investment advisers ("RIAs"), meaning that the firms received compensation from direct fees from the Plans, as well as fees or commissions from money managers and/or insurance providers.

134.    SAI is owned by a brokerage firm Lamon & Stern. Stifel Pearl Street is part of a brokerage firm, Stifel Financial Corp., and has been fined by the SEC for breaches of fiduciary duty in connection with its mutual fund share class selection practices and fees.

135.    Prof. Nicole M. Boyson of Northeastern University, using data from the 2019 SEC fines of Wells Fargo and others, has written a paper which shows that RIAs that both charge fees and commissions (dual registration) use higher-fee, lower-performing mutual fund families that kick back the most in "revenue sharing." Boyson, N., *The worst of both worlds? Dual-registered Investment Advisers*, Northeastern U. D'Amore-McKim School of Business Research Paper No. 3360537 (Dec. 2019).[22]

136.    Prof. Boyson has created a list of high-fee underperforming mutual funds preferred by dual registered RIAs, which includes JP Morgan, Prudential (PGIM), and Fidelity. Given Defendants' retention of SAI and Stifel Pearl Street, it

---

[22] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360537 (last visited June 20, 2020).

is no coincidence that Defendants have selected at least 17 funds from these high-fee fund families during the Class Period.

137.   Broker consultants or dual registered RIAs have an inherent conflict of interest to recommend what pays them the most. Defendants, as fiduciaries of the Plan, should have been aware that both SIA and Stifel Pearl Street were subject to such potential conflicts, but disregarded such risks in retaining these consultants and investment advisors.

138.   SAI and Stifel Pearl Street are parties in interest under 29 U.S.C. § 1002(14), as they provide services to the Plans. Defendants, as fiduciaries to the Plans, thus also engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1)(C), by causing the Plans to engage in a transaction constituting a direct or indirect furnishing of goods or services between the Plans and parties in interest using assets of the Plans. These transactions do not qualify for a statutory exemption under 29 U.S.C. § 1108(b)(2), as reasonable compensation for plan service providers, 29 C.F.R. § 2250.408c-2, as the fees charged were high and unreasonable.

139.   Defendants breached their fiduciary duty of loyalty by retaining these conflicted dual-registered investment advisers, which placed the interests of high-fee fund families above the interests of the Plans and their participants and beneficiaries and burdened the Plans with imprudent investment options throughout the Class Period, as detailed below.

**C.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select the Lowest Cost Share Class of Funds in the Plans**

140.   The Supreme Court has reaffirmed the ongoing fiduciary duty to monitor a Plans' investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

141.   The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (*quoting Nat'l Conference of Comm'rs on Uniform State Laws*, Uniform Prudent Investor Act § 2I (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

142.   Under trust law, one of the responsibilities of the Plans' fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement

(Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the Plans' investments are "improvident," or if there is a "superior alternative investment" to any of the Plans' holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

143.   When large plans, like the Plans, have options to select among as many as five classes of shares there is no loyal or prudent reason to select a more expensive share class of the fund when the Plans have more than sufficient assets to qualify for the least expensive institutional share class – the higher cost shares are simply more expensive. Defendants had a fiduciary obligation to perform a careful review of each investment option offered by the Plans and determine whether the Plans were availing themselves of the lowest-cost share class of each option.

144.   As demonstrated by the chart below, which compares the fund chosen by Defendants against the fund's own lower cost share class in the same investment, Defendants failed to prudently monitor the Plans to determine whether the Plans were invested in the lowest-cost share class available for the Plans' funds. These lowest-cost share class funds are identical to the funds in the Plans in every way except for their lower cost and identical or better performance. The chart below uses 2020

expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plans were than *multiple* available lower-cost share classes.

| CURRENT FUND OPTION | NET[23] EXPENSE RATIO | SAME FUND LOWER FEE SHARE CLASS | NET EXPENSE RATIO |
|---|---|---|---|
| JTTIX $7,971,566 JPMorgan SmartRetirement® 2020 R5 | 0.55 % | JTTAX JPMorgan SmartRetirement® 2020 R6 | 0.44 % |
| JNSIX $21,468,296 JPMorgan SmartRetirement® 2025 R5 | 0.56 % | JNSYX JPMorgan SmartRetirement® 2025 R6 | 0.45 % |
| JSMIX $28,608,878 JPMorgan SmartRetirement® 2030 R5 | 0.56 % | JSMYX JPMorgan SmartRetirement® 2030 R6 | 0.46 % |
| SRJIX $25,701,170 JPMorgan SmartRetirement® 2035 R5 | 0.56 % | SRJYX JPMorgan SmartRetirement® 2035 R6 | 0.46 % |
| SMTIX $17,011,248 JPMorgan SmartRetirement® 2040 R5 | 0.57 % | SMTYX JPMorgan SmartRetirement® 2040 R6 | 0.47 % |
| JSAIX $9,414,893 JPMorgan SmartRetirement® 2045 R5 | 0.57 % | JSAYX JPMorgan SmartRetirement® 2045 R6 | 0.47 % |
| JTSIX $7,606,543 JPMorgan SmartRetirement® 2050 R5 | 0.57 % | JTSYX JPMorgan SmartRetirement® 2050 R6 | 0.47 % |
| JFFIX $7,413,175 JPMorgan SmartRetirement® 2055 R5 | 0.57 % | JFFYX JPMorgan SmartRetirement® 2055 R6 | 0.47 % |
| JAKIX $2,504,174 JPMorgan SmartRetirement® 2060 R5 | 0.56 % | JAKYX JPMorgan SmartRetirement® 2060 R6 | 0.46 % |
| JANEX $28,758,406 Janus Henderson Enterprise T | 0.91% | JDMNX Janus Henderson Enterprise N | 0.66 % |

---

[23] As of September 30, 2020.

| | | | |
|---|---|---|---|
| GTSVX $17,662,528<br>Invesco Small Cap Growth R5 | 0.80 % | GTSFX<br>Invesco Small Cap Growth R6 | 0.71 % |
| WFMIX $10,661,404<br>Wells Fargo Special Mid Cap Value Inst. | 0.82 % | WFPRX<br>Wells Fargo Special Mid Cap Value R6 | 0.72% |
| ESPNX $4,485,221<br>Wells Fargo Special Small Cap Value Inst | 0.95 % | ESPRX<br>Wells Fargo Special Small Cap Value R6 | 0.87% |
| JSIIX $3,239,788<br>JPMorgan SmartRetirement® Income R5 | 0.52 % | JSIYX<br>JPMorgan SmartRetirement® Income R6 | 0.42% |
| ANAGX $2,613,256<br>AB Global Bond A | 0.81 % | ANAIX<br>AB Global Bond I | 0.55% |
| PHYZX $8,711,539<br>PGIM High Yield Z | 0.54% | PHYQX<br>PGIM High Yield R6 | 0.40% |

145.   As the chart above illustrates, Defendants should have known of the existence and availability of cheaper share classes. They also should have promptly transferred the Plans' investments in such funds to these less expensive share classes but failed to do so. Defendants' failures to select the lowest cost share class available caused Plan participants to pay excessive fees, which has diminished and will continue to diminish the value of their individual 401(k) accounts.

146.   Qualifying for lower share classes often requires only a minimum investment of $1 million for an individual fund. As demonstrated in the table above, each of the funds had more than $2 million in assets, and therefore, the Plan would have easily qualified for lower share classes for these funds.

147.   A prudent fiduciary conducting an impartial review of the Plans' investments would have identified the cheaper share classes available, chosen that cheaper share class initially, and/or transferred the Plans' investments in the more expensive referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not choose these cheaper funds or transfer Plan holdings in any of these funds into the lowest-cost institutional shares, in breach of their fiduciary duties.

148.   There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

## D.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

149.   The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that investment in these funds was imprudent due to their high costs.

150.   During the Class Period, the Plans lost millions of dollars by offering investment options that had similar, if not identical, characteristics to other lower-priced investment options, but had much higher expenses.

54

151.   Using services that are readily available to ERISA fiduciaries to analyze the current Plans' offerings, as reported in the Form 5500 for the year ended December 31, 2018, 17 out of the 25 funds in the Plan – 68% of the funds – were significantly more expensive than comparable funds found in similarly-sized plans (plans having $250 million to $500 million in assets). The expense ratios for funds in the Plans in some cases are as much as **625%** greater than the expense ratio for comparable funds available to the Plans. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015*, at 69 (March 2018) (hereafter, "ICI Study").[24]

152.   The table below provides a comparison of the funds that were available to Participants during the 2018 and 2019 plan years to substantially similar funds that are in the same Morningstar fund category and use the same benchmark index (most of which have at least 90 percent similar holdings), but have significantly lower net expense ratios:

| CURRENT FUND OPTION | NET EXPENSE RATIO | SIMILAR FUND WITH LOWER FEE | NET EXPENSE RATIO |
|---|---|---|---|
| JTTIX $7,971,566 **JPMorgan SmartRetirement® 2020 R5** Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.55 % | FFEDX **Fidelity Freedom Index 2020 Instl Prem** Benchmark: Morningstar Lifetime Mod 2020 TR USD | 0.08 % |

---

[24] *See* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf. (last visited Oct. 29, 2020).

| CURRENT FUND OPTION | NET EXPENSE RATIO | SIMILAR FUND WITH LOWER FEE | NET EXPENSE RATIO |
|---|---|---|---|
| JNSIX $21,468,296 **JPMorgan SmartRetirement® 2025 R5** Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.56 % | FFEDX **Fidelity Freedom Index 2025 Instl Prem** Benchmark: Morningstar Lifetime Mod 2025 TR USD | 0.08% |
| JSMIX $28,608,878 **JPMorgan SmartRetirement® 2030 R5** Benchmark: Morningstar Lifetime Mod 2030 TR USD | 0.56 % | FFEGX **Fidelity Freedom Index 2030 Instl Prem** Benchmark: Morningstar Lifetime Mod 2030 TR USD | 0.08% |
| SRJIX $25,701,170 **JPMorgan SmartRetirement® 2035 R5** Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.56 % | FFEZX **Fidelity Freedom Index 2035 Instl Prem** Benchmark: Morningstar Lifetime Mod 2035 TR USD | 0.08% |
| SMTIX $17,011,248 **JPMorgan SmartRetirement® 2040 R5** Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.57 % | FFIZX **Fidelity Freedom Index 2040 Instl Prem** Benchmark: Morningstar Lifetime Mod 2040 TR USD | 0.08 % |
| JSAIX $9,414,893 **JPMorgan SmartRetirement® 2045 R5** Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.57 % | FFOLX **Fidelity Freedom Index 2045 Instl Prem** Benchmark: Morningstar Lifetime Mod 2045 TR USD | 0.08 % |
| JTSIX $7,606,543 **JPMorgan SmartRetirement® 2050 R5** Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.57 % | FFOPX **Fidelity Freedom Index 2050 Instl Prem** Benchmark: Morningstar Lifetime Mod 2050 TR USD | 0.08 % |
| JFFIX $7,413,175 **JPMorgan SmartRetirement® 2055 R5** Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.57 % | FFLDX **Fidelity Freedom Index 2055 Instl Prem** Benchmark: Morningstar Lifetime Mod 2055 TR USD | 0.08 % |
| JAKIX $2,504,174 **JPMorgan SmartRetirement® 2060 R5** Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.56 % | FFLEX **Fidelity Freedom Index 2060 Instl Prem** Benchmark: Morningstar Lifetime Mod 2060 TR USD | 0.08 % |
| DODFX $22,929,101 **Dodge & Cox International Stock** Benchmark: MSCI ACWI Ex USA Value NR USD | 0.63 % | VTRIX **Vanguard International Value Inv** MSCI ACWI Ex USA Value NR USD | 0.37% |

| CURRENT FUND OPTION | NET EXPENSE RATIO | SIMILAR FUND WITH LOWER FEE | NET EXPENSE RATIO |
|---|---|---|---|
| JANEX $28,758,406 **Janus Henderson Enterprise T** Benchmark: Russell Mid Cap Growth TR USD | 0.91% | OEGIX **Invesco Oppenheimer Discv Mid Cap Gr R6** Benchmark: Russell Mid Cap Growth TR USD | 0.69% |
| | | SCHM Schwab US Mid-Cap ETF Benchmark: Russell Mid Cap Growth TR USD | 0.04% |
| GTSVX $17,662,528 **Invesco Small Cap Growth R5** Benchmark: Russell 2000 Growth TR USD | 0.80% | VRTGX **Vanguard Russell 2000 Growth Index Fund Institutional Shares** Benchmark: Russell 2000 Growth TR USD | 0.08% |
| | | WBRRFX **Blackrock Russell 2000 Growth Index Collective Investment Trust Class R** Benchmark: Russell 2000 Growth TR USD | 0.08% |
| WFMIX $10,661,404 **Wells Fargo Special Mid Cap Value Inst.** Benchmark: Russell Mid Cap Value TR USD | 0.82% | VMVAX **Vanguard Mid-Cap Value Index Admiral** Benchmark: Russell Mid Cap Value TR USD | 0.07% |
| PHYZX $8,711,539 **PGIM High Yield Z** Benchmark: ICE BofA US High Yield TR USD | 0.54% | USHY **IShares Broad USD High Yield Corporate Bond ETF** Benchmark: ICE B of A US High Yield TR USD | 0.22% |
| | | VWEAX **Vanguard High-Yield Corporate Adm** Benchmark: ICE BofA US High Yield TR USD | 0.13% |
| VWNAX $6,426,908 **Vanguard Windsor II Fund Admiral Shares** Benchmark: Russell 1000 Value Index | 0.26% | VONV **Vanguard Russell 1000 Value ETF** Benchmark: Russell 1000 Value Index | 0.08% |
| ESPNX $4,485,221 **Wells Fargo Special Small Cap Value Inst** Benchmark: Russell 2000 Value Index | 0.95% | VRTVX **Vanguard Russell 2000 Value Index Fund** Benchmark: Russell 2000 Value Index | 0.08% |

| CURRENT FUND OPTION | NET EXPENSE RATIO | SIMILAR FUND WITH LOWER FEE | NET EXPENSE RATIO |
|---|---|---|---|
| ANAGX $2,613,256<br>**AB Global Bond A**<br>Benchmark: Bloomberg Barclays Global Aggregate ex-USD Float Adjusted RIC Capped Index Hedged | 0.81% | VTIFX<br>**Vanguard Total International Bond Index Fund Institutional Shares**<br>Benchmark: Bloomberg Barclays Global Aggregate ex-USD Float Adjusted RIC Capped Index Hedged | 0.07% |

153.   The comparisons in the table above demonstrate that for at least 17 out of the 25 funds currently in the Yanfeng Plan, there are equivalent investments that would cost participants far less than the funds selected for the Plans by Defendants.

154.   The chart above demonstrates that the expense ratios of the Plans' investment options were more expensive by multiples of comparable alternative funds in the same investment style. A reasonable investigation by the Plans' fiduciaries would have revealed the existence of these and many other lower-cost alternatives.

155.   For example, the 0.55 - 0.58% expense ratios of the JPMorgan SmartRetirement® age-targeted funds is **587.5% - 625%** greater than the 0.08% expense ratio of the comparable Fidelity Freedom Index Institutional Premium target date funds.

156.   Defendants cannot justify their selection and retention of the JPMorgan funds on the basis that the performance of those funds has been superior to the lower cost investment options. On the contrary, during the Class Period, the far less

expensive Fidelity Freedom Index Institutional Premium target date funds outperformed the JPMorgan SmartRetirement® target date funds (R5) for 1Y, 3Y and 5Y benchmarks measured on a quarterly basis. *See* Performance Chart at ¶ 146.

157.   An additional striking detail concerning the inclusion of these high expense JPMorgan target date funds is that they were the *default* investment option for Participants who enroll but fail to immediately make their elections. SPD at 11. As of December 31, 2018, approximately 35% of the fund's assets were invested in the JPMorgan SmartRetirement® target date funds. *See* Form 5500 for 2018, at Schedule H (setting forth the dollar values of the funds' holdings).

### E.   Defendant Imprudently Chose Historically Underperforming Investments

158.   Given Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment options underperformed both benchmarks and lower-cost alternative investments that were available to the Plans for their fund categories.

159.   Prudent fiduciaries of large defined contribution plans must regularly analyze the Plans' investment options to determine whether its actively managed funds will outperform benchmarks, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to

continue to offer that particular actively managed option for the particular investment style and asset class.

160.   Defendants failed to undertake such analyses when they selected and retained the actively managed funds in the chart, below. Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

161.   Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds in the chart below underperformed their respective fund categories' benchmarks over extended periods.

162.   Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plans' investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

163.   The following performance charts compare the investment returns of certain of the Plans' investments to benchmarks in their funds' categories for the

one-, three-, and five-year periods ending March 31, 2020. Each of the "Low-Fee Alternatives" in the chart are assigned by Morningstar to the same fund category as the "In Plan Option" to which they are compared, and each of the "Low-Fee Alternatives" are benchmarked by Morningstar to the exact same market index as the "In-Plan Option," unless otherwise noted. The applicable benchmark for both the "In-Plan Option" and the "Low Fee Alternatives" is set forth in the column titled "Performance Relative to Benchmark." It shows that the Yanfeng Plan's investment options under-performed benchmarks and lower cost alternatives.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2020 TR USD for category Target Date 2020 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JTTIX $7,971,566 JPMorgan SmartRetirement 2020 R5[25] | 0.54% | -2.99% | 2.63% | 2.83% | -2.64% | -1.64% | -0.98% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSBOX State Street Target Retirement 2020 K | 0.09% | -3.16% | 3.09% | 3.34% | -1.07% | -0.43% | -0.18% |
| FPIFX Fidelity Freedom Index 2020 Investor | 0.12% | -1.62% | 3.81% | 3.89% | -0.04% | 0.23% | 0.19% |
| VTWNX Vanguard Target Retirement 2020 Inv | 0.13% | -2.64% | 3.28% | 3.58% | -0.68% | -0.33% | -0.01% |
| DRIRX Dimensional 2020 Target Dt Rtr Inc Instl | 0.20% | 5.30% | 4.73% | - | 3.97% | 0.55% | - |
| TLWPX TIAA-CREF Lifecycle Index 2020 Premier | 0.25% | -1.78% | 3.57% | 3.71% | 0.19% | 0.01% | 0.11% |

---

[25] The benchmark index for this fund is Morningstar Lifetime Mod 2020 TR USD.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2025 TR USD for category Target Date 2025 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JNSIX $21,468,296 JPMorgan SmartRetirement 2025 R5[26] | 0.55 % | -5.15 % | 2.30 % | 2.74 % | -2.65% | -1.38% | -0.95% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSBSX State Street Target Retirement 2025 K | 0.09 % | -3.56 % | 3.61 % | 3.82 % | 0.81% | 0.48% | 0.48% |
| FQIFX Fidelity Freedom Index 2025 Investor | 0.12 % | -2.75 % | 3.68 % | 3.93 % | 0.30% | 0.29% | 0.17% |
| VTTVX Vanguard Target Retirement 2025 Inv | 0.13 % | -4.31 % | 3.07 % | 3.60 % | -0.43% | -0.22% | 0.04% |
| DRIUX Dimensional 2025 Target Dt Rtr Inc Instl | 0.21 % | 4.14 % | 4.99 % | - | 5.22% | 1.18% | - |
| TLVPX TIAA-CREF Lifecycle Index 2025 Premier | 0.25 % | -3.26 % | 3.43 % | 3.80 % | 0.39% | 0.12% | 0.18% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2030 TR USD for category Target Date 2030 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JSMIX $28,608,878 JPMorgan SmartRetirement 2030 R5[27] | 0.56 % | -7.13 % | 2.14 % | 2.65 % | -2.64 % | -1.64 % | -0.98 % |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSBYX State Street Target Retirement 2030 K | 0.09 % | -3.85 % | 3.81 % | 4.06 % | 2.84% | 1.10% | 0.83% |
| FXIFX Fidelity Freedom Index 2030 Investor | 0.12 % | -4.38 % | 3.69 % | 4.22 % | 1.02% | 0.74% | 0.56% |
| VTHRX Vanguard Target Retirement 2030 Inv | 0.14 % | -5.78 % | 2.80 % | 3.56 % | 0.26% | -0.07% | 0.06% |
| DRIWX Dimensional 2030 Target Dt Rtr Inc Instl | 0.23 % | 1.60 % | 4.69 % | - | 5.84% | 1.43% | - |
| TLHPX TIAA-CREF Lifecycle Index 2030 Premier | 0.25 % | -4.75 % | 3.30 % | 3.89 % | 1.12% | 0.37% | 0.34% |

[26] The benchmark index for this fund is Morningstar Lifetime Mod 2025 TR USD.
[27] The benchmark index for this fund is Morningstar Lifetime Mod 2030 TR USD.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2035 TR USD for category Target Date 2035 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| SRJIX $25,701,170 JPMorgan SmartRetirement 2035 R5[28] | 0.56 % | -9.24 % | 1.39 % | 2.29 % | -0.95% | -0.85% | -0.25% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSCKX State Street Target Retirement 2035 K | 0.09 % | -5.22 % | 3.56 % | 4.01 % | 4.01% | 1.46% | 1.00% |
| FIHFX Fidelity Freedom Index 2035 Investor | 0.12 % | -7.39 % | 3.06 % | 4.06 % | 1.66% | 1.13% | 0.87% |
| VTTHX Vanguard Target Retirement 2035 Inv | 0.14 % | -7.25 % | 2.53 % | 3.51 % | 1.44% | 0.28% | 0.24% |
| DRIGX Dimensional 2035 Target Dt Rtr Inc Instl | 0.24 % | -3.42 % | 3.36 % | - | 4.30% | 0.86% | - |
| TLYPX TIAA-CREF Lifecycle Index 2035 Premier | 0.25 % | -6.18 % | 3.11 % | 3.94 % | 2.31% | 0.88% | 0.64% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2040 TR USD for category Target Date 2040 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| SMTIX $17,011,248 JPMorgan SmartRetirement 2040 R5[29] | 0.57 % | -10.69 % | 1.09 % | 2.20 % | 0.11% | -0.45% | -0.57% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSCQX State Street Target Retirement 2040 K | 0.09 % | -6.50 % | 3.23 % | 3.84 % | 4.92% | 1.78% | 1.13% |
| FBIFX Fidelity Freedom Index 2040 Investor | 0.12 % | -8.93 % | 2.50 % | 3.74 % | 2.55% | 1.34% | 0.96% |
| VFORX Vanguard Target Retirement 2040 Inv | 0.14 % | -8.74 % | 2.23 % | 3.43 % | 2.51% | 0.74% | 0.51% |
| TLPRX TIAA-CREF Lifecycle Index 2040 Premier | 0.25 % | -7.76 % | 2.86 % | 3.93 % | 3.32% | 1.39% | 1.00% |

---

[28] The benchmark index for this fund is Morningstar Lifetime Mod 2035 TR USD.
[29] The benchmark index for this fund is Morningstar Lifetime Mod 2040 TR USD.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2045 TR USD for category Target Date 2045 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JSAIX $9,414,893 JPMorgan SmartRetirement 2045 R5[30] | 0.57 % | -12.00 % | 0.64 % | 1.95 % | 0.51% | -0.28% | -0.45% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSDEX State Street Target Retirement 2045 K | 0.09 % | -7.95 % | 2.87 % | 3.70 % | 5.24% | 2.02% | 1.33% |
| FIOFX Fidelity Freedom Index 2045 Investor | 0.12 % | -8.96 % | 2.49 % | 3.73 % | 3.53% | 1.69% | 1.12% |
| VTIVX Vanguard Target Retirement 2045 Inv | 0.15 % | -10.21 % | 1.77 % | 3.21 % | 3.01% | 0.99% | 0.73% |
| TLMPX TIAA-CREF Lifecycle Index 2045 Premier | 0.25 % | -9.33 % | 2.44 % | 3.77 % | 3.78% | 1.69% | 1.27% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2050 TR USD for category Target Date 2050 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JTSIX $7,606,543 JPMorgan SmartRetirement 2050 R5[31] | 0.57% | -11.98% | 0.65% | 1.96% | 0.94% | -0.08% | -0.33% |
| LOW-FEE ALTERNATIVES | | | | | | | |
| SSDLX State Street Target Retirement 2050 K | 0.09% | -8.49% | 2.63% | 3.54% | 5.46% | 2.11% | 1.39% |
| FIPFX Fidelity Freedom Index 2050 Investor | 0.12% | -8.95% | 2.50% | 3.72% | 3.95% | 1.87% | 1.26% |
| VFIFX Vanguard Target Retirement 2050 Inv | 0.15% | -10.17% | 1.79% | 3.23% | 3.45% | 1.19% | 0.85% |
| TLLPX TIAA-CREF Lifecycle Index 2050 Premier | 0.25% | -9.55% | 2.41% | 3.80% | 4.11% | 1.89% | 1.47% |

---

[30] The benchmark index for this fund is Morningstar Lifetime Mod 2045 TR USD.

[31] The benchmark index for this fund is Morningstar Lifetime Mod 2050 TR USD.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2055 TR USD for category Target Date 2055 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JFFIX $7,413,175 JPMorgan SmartRetirement 2055 R5[32] | 0.57% | -11.93% | 0.67% | 1.99% | 1.13% | 0.03% | -0.22% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| SSDQX State Street Target Retirement 2055 K | 0.09% | -8.50% | 2.67% | 3.58% | 5.52% | 2.23% | 1.49% |
| FDEWX Fidelity Freedom Index 2055 Investor | 0.12% | -8.94% | 2.50% | 3.72% | 4.08% | 1.97% | 1.34% |
| VFFVX Vanguard Target Retirement 2055 Inv | 0.15% | -10.21% | 1.78% | 3.19% | 3.56% | 1.28% | 0.91% |
| TTIPX TIAA-CREF Lifecycle Index 2055 Premier | 0.25 % | -9.80 % | 2.36 % | 3.83 % | 4.15% | 2.01% | 1.61% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Morningstar Lifetime Mod 2060 TR USD for category Target Date 2060 | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JAKIX $2,504,174 JPMorgan SmartRetirement 2060 R5[33] | 0.56% | -12.01% | 0.64% | - | 1.17% | 0.14% | |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| SSDYX State Street Target Retirement 2060 K | 0.09% | -8.31% | 2.67% | 3.55% | 5.77% | 2.33% | 1.56% |
| FDKLX Fidelity Freedom Index 2060 Investor | 0.12% | -8.95% | 2.51% | 3.72% | 4.16% | 2.05% | 1.42% |
| VTTSX Vanguard Target Retirement 2060 Inv | 0.15% | -10.18% | 1.79% | 3.20% | 3.69% | 1.38% | 1.01% |
| TVIPX TIAA-CREF Lifecycle Index 2060 Premier | 0.25% | -10.02% | 2.31% | 3.86% | 4.26% | 2.15% | 1.77% |

164.    As shown in the tables above, each of the in-Plan JPMorgan SmartRetirement target date funds (other than the 2060 fund) underperformed its

---

[32] The benchmark index for this fund is Morningstar Lifetime Mod 2055 TR USD.
[33] The benchmark index for this fund is Morningstar Lifetime Mod 2060 TR USD.

benchmark index. Moreover, all of these funds significantly underperformed far less expensive target retirement date funds from numerous fund families, including State Street, Fidelity, Vanguard and TIAA-CREF. Had Defendants undertaken a reasonable investigation of the marketplace for target retirement date funds that were available to similar large 401(k) plans, they would have readily discerned that the costs of the JPMorgan SmartRetirement funds were unreasonable, and that far better options were available to the Plan. Thus, Defendants' selection and retention of the JPMorgan SmartRetirement funds, despite the abundance of superior options, bespeaks a flawed fiduciary process and breach of Defendants' fiduciary duties.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark MSCI ACWI Ex USA Value NR for category foreign large value | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| DODFX $22,929,101 **Dodge & Cox International Stock** Benchmark: iShares MSCI EAFE ETF | 0.63% | -22.28% | -7.42% | -4.39% | 1.61% | -7.42% | -5.34% | -3.66% | -0.96% |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| FSPSX **Fidelity International Index** Benchmark: iShares MSCI EAFE ETF | 0.04% | -14.63% | -1.85% | -0.56% | 2.81% | 0.23% | 0.23% | 0.17 % | - |
| FSGGX **Fidelity Global ex US Index** Benchmark: iShares MSCI EAFE ETF | 0.06% | -15.72% | -2.04% | -0.65% | - | -0.86% | 0.04% | 0.08 % | - |
| VFWSX **Vanguard FTSE All-Wld ex-US Idx Instl** Benchmark: iShares MSCI EAFE ETF | 0.08% | -15.81% | -2.13% | -0.50% | 2.24% | -0.95% | -0.05% | 0.23 % | -0.33% |
| VTSNX **Vanguard Total Intl Stock Index I** – Benchmark: iShares MSCI EAFE ETF | 0.08% | -16.55% | -2.52% | -0.65% | 2.09% | -1.69% | -0.44% | 0.08 % | 4.37% |
| MKRZX **MM MSCI EAFE International Index I** Benchmark: iShares MSCI EAFE ETF | 0.23% | -14.36% | -1.83% | -0.60% | - | 0.50% | 0.25% | 0.13 % | - |

165.   As shown in the table above, the Dodge & Cox International Stock fund, which has an expense ratio of 0.63%, underperformed the benchmark consistently for a decade, by -7.42% at 1Y, -5.34% at 3Y, -3.66% at 5Y and -0.96% at 10Y. Thus, this fund has been excessively expensive without providing any performance benefit. By comparison, numerous similar, passively managed index funds, with expense ratios less than 0.10%, outperformed the Dodge & Cox International Stock fund. Accordingly, Defendants' selection and retention of the Dodge & Cox International Stock fund, despite the abundance of superior options that were readily available to the Plan, is strong evidence of a flawed fiduciary process and breach of Defendants' fiduciary duties.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Russell Mid Cap Growth TR for category Mid Cap Growth | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| JAENX $28,758,406 **Janus Henderson Enterprise T** Benchmark: iShares Russell Mid-Cap Growth ETF (IWP) | 0.91% | -12.95% | 6.17% | 6.73% | -2.38% | -0.12% | 1.34% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| JDMNX **Janus Henderson Enterprise N** Benchmark: iShares Russell Mid-Cap Growth ETF (IWP) | 0.66% | -12.74 % | 6.43 % | 6.99 % | -2.94 % | 0.16 % | 1.61 % |
| OEGIX **Invesco Oppenheimer Discv Mid Cap Gr R6** Benchmark: iShares Russell Mid-Cap Growth ETF (IWP) | 0.69% | -2.40 % | 9.02 % | 7.24 % | 7.40 % | 2.75 % | 1.86 % |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark Russell 2000 Value TR for category Small Value | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| ESPNX $4,485,221 **Wells Fargo Special Small Cap Value Inst** Benchmark: Russell 2000 Value Index | 0.95 % | -24.85% | -6.36% | -0.39% | 5.24% | 3.36% | 2.21% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| ESPRX **Wells Fargo Special Small Cap Value R6** Benchmark: Russell 2000 Value Index | 0.87 % | -24.78% | -6.29% | -0.33% | 5.31% | 3.43% | 2.27% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark BBgBarc Global Aggregate TR Hdg for category World Bond UDS-Hedged | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| ANAGX $2,613,256 **AB Global Bond A** Benchmark: Bloomberg Barclays Global Aggregate ex-USD Float Adjusted RIC Capped Index Hedged | 0.81 % | 0.59% | 1.97% | 2.17% | -3.21% | -1.58% | -1.01% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| ANAIX **AB Global Bond I** Benchmark: Bloomberg Barclays Global Aggregate ex-USD Float Adjusted RIC Capped Index Hedged I | 0.55% | 0.99% | 2.29% | 2.45% | -2.81% | -1.27% | -0.73% |
| VTIFX **Vanguard Total International Bond Index Fund Institutional Shares** Benchmark: Bloomberg Barclays Global Aggregate ex-USD Float Adjusted RIC Capped Index Hedged | 0.07% | 4.82% | 4.47% | 3.39% | -0.19% | -0.17% | -0.18% |

166.   As shown in the table above, with respect to the Janus Henderson Enterprise fund, the Wells Fargo Special Small Cap Value fund, and the AB Global Bond fund, Defendants failed to select the lowest-cost share class for the Plan. Moreover, the lower-cost share classes of these funds would have provided superior returns for investors. Furthermore, for each of these funds, there were alternative investments that were less costly than even the lowest-cost share class of such funds

and performed far better than either the in-Plan fund or the lowest-cost share class of the in-Plan fund. Accordingly, Defendants' selection and retention of these funds, despite the abundance of readily available, superior options, is strong evidence of a flawed fiduciary process and a breach of Defendants' fiduciary duties.

167.   The excessive costs and poor performance of the funds currently in the Plan is nothing new – the predecessor Plans also employed a flawed fiduciary process that resulted in the selection and maintenance of imprudent investments, like those in the table below:

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Benchmark Relative | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **FLPKX** **Fidelity Low Priced Stock Fund K** Benchmark: Russell Mid Cap Value TR USD | 0.69% | 4.24% | 3.57% | 6.84% | 11.54% | 2.75% | 0.46% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| **FLPSX** **Fidelity Low Priced Stock Fund K6** | 0.50% | 3.80% | 3.68% | — | 11.10% | 2.86% | |
| **TRHYX** **T. Rowe Price Instit. High Yield** | 0.50% | 1.53% | 3.62% | 6.26% | -0.77% | -0.21% | -0.365 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Benchmark Relative | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| **MWHYX** **Metropolitan West High Yield Bond Fund M** Benchmark: ICE BofA US High Yield TR USD | 0.84% | 7.92% | 5.81% | 6.14% | 5.62% | 1.98% | -0.48% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| **MWHIX** **Metropolitan West High Yield Bond Fund I** | 0.61% | 8.19% | 6.08% | 6.40% | 5.89% | 2.24% | -0.21% |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | Performance Relative to Benchmark | | |
|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 1Y | 3Y | 5Y |
| TGBAX **Templeton Global Bond Avd.** Benchmark: ICE BofA USD 3M Dep OR CM TR USD | 0.67% | -3.42% | -1.50% | 1.71% | -4.99% | -3.50% | 0.22% |
| **LOW-FEE ALTERNATIVES** | | | | | | | |
| BSIIX **Blackrock Strategic Income Opps Inst.** | 0.62% | 4.61% | 3.62% | 3.67% | 3.04% | 1.62% | 2.17% |
| PMZIX **PIMCO Mortgage Opp. and Bond Instit.** | 0.60% | 4.40% | 3.49% | 4.12% | 2.79% | 1.71% | 1.14% |

168.    In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to properly evaluate the funds before selection, failed to monitor the funds in the chart above, and retained these funds despite their continuing underperformance compared to the benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plans for each of these investments.

169.    Prudent fiduciaries of defined contribution plans must evaluate investments before selection and then continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced

options. Under the standards used by prudent independent fiduciaries, the funds in the chart above would have been removed from the Plans.

170. Had the Defendant removed these funds from the Plans and the amounts been invested in any of the lower-cost alternatives identified herein, participants in the Plans would not have lost millions of dollars' worth of their retirement savings.

## F.   Defendants Failed to Monitor or Control the Plans' Recordkeeping and Other Administrative Expenses

171. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the Plans' "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed

account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

172.   The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

173.   According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[34]

174.   The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the majority of plans are charged on a per-participant basis.

175.   Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a

---

[34]Available at
https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf (last visited Oct. 29, 2020).

combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the Plans' recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

176.   It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See, e.g., Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

177.  Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

178.   Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the Plans' recordkeeper. To the extent that a Plans' investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

179.   Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

180.   Defendants have failed to prudently manage and control the Plans' recordkeeping and administrative expenses by failing to undertake any of the aforementioned steps because, among other things, there is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was unreasonable.

181.   According to Plan's financial statements filed with the Department of Labor on Form 5500, Fidelity received direct compensation from the Plan for *recordkeeping services alone* in the following amounts:

| Year | No. of Participants | Disclosed Recordkeeping Direct Costs | Disclosed Indirect Expense to Plan Paid to Fidelity | Total Disclosed Recordkeeping Expenses | Total Indirect Expense to Plan | Per Participant Cost Disclosed |
|------|---------------------|--------------------------------------|-----------------------------------------------------|----------------------------------------|--------------------------------|--------------------------------|
| 2019 | 3,167 | $94,929 | $230,138 | $325,067 | undisclosed | $102.64 |
| 2018 | 6,739 | $196,161 | $149,981 | $346,142 | undisclosed | $51.36 |
| 2017 | 7,023 | $267,044 | undisclosed | $415,674 | undisclosed | $59.19 |
| 2016 | 6,001 | $365,862 | undisclosed | $365,862 | undisclosed | $60.96 |
| 2015 | 5,138 | $192,688 | undisclosed | $192,688 | undisclosed | $37.50 |

182.   It is striking that from 2015 to 2016, Fidelity raised its direct recordkeeping fees from $192,688 to $365,862 – an increase of 89.8%. During this same period, the number of participants increased from 5,138 to 6,001 – an increase of 16.7%. This dramatic, unchecked increase in recordkeeping fees represents a 62.56% increase in the per participant cost of recordkeeping from 2015 to 2016.

183. Although the disclosed recordkeeping expenses were essentially unchanged in 2017, and decreased slightly in 2018, inexplicably the Plans' recordkeeping expenses nearly doubled for 2019, hitting $102.64 per participant. Given the fact that the market for recordkeeping has become more competitive during the Class Period, the Plans' increasing recordkeeping costs are particularly alarming. Moreover, the amount of recordkeeping fees disclosed by Defendants does not include substantial indirect compensation paid to Fidelity through revenue sharing arrangements, which have not been fully disclosed by Defendants.

184. Specifically, the Plans paid substantial amounts through revenue sharing arrangements with the various fund families through which the Plans offer investment options. *See* Form 5500 for 2018, Schedule C (reporting only that Fidelity received indirect compensation without disclosing the amounts of such compensation). Defendants have breached their fiduciary duty of loyalty by failing to disclose to Plaintiffs and the Class the actual dollar amounts of revenue sharing payments made to Fidelity throughout the Class Period.

185. In recent defined contribution plan excessive fee litigation, *Ramos v. Banner Health*, 2020 WL 2553705 (D. Colo. May 20, 2020) (bench trial), the Court found it "highly significant" that Defendant went nearly twenty years without soliciting competitive bids for recordkeeping services through a request for proposal. The Court also agreed with plan participants that the Plans' prior recordkeeping

arrangement—in which the plan paid uncapped, asset-based fees to Fidelity through a contract with no termination date—warranted closer scrutiny by the Defendant's plan committee. In that case, the Plan committee "never assessed the reasonableness of fees using any form of a competitive bid process, RFP or otherwise." Here, Defendants could have obtained substantially lower fees for comparable recordkeeping services if they had undertaken a truly competitive bidding process for recordkeeping services during the Class Period.

186.   The total amount of recordkeeping and administrative fees paid during the Class Period on a per participant basis has been unreasonable. Based on Plaintiffs' investigation and analysis, normal recordkeeping fees for plans with similar assets and fewer than 12,000 participants would have been between $20 and $40 per participant at the *beginning* of the Class Period in 2014, and lower in ensuing years as a reflection of the general trend of decreasing recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d 786 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.

Mass. June 15, 2016) (401(k) fee settlement committing the plan to pay not more than $35 per participant for recordkeeping).

187.  Given the size of the Plans during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper. Here, Defendants overhauled the Plans in or about 2017, but they selected high cost funds, including the default JPMorgan SmartRetirement® funds, which were many times more expensive and performed worse than comparable funds, and failed to take any reasonable and prudent steps to obtain lower-cost recordkeeping and administrative services for the Plans.

188.  As the Plans' recordkeeper, Fidelity provides the following services:

- establishes and maintains systems for Participants' enrollment,
- manages investment elections and contributions,
- communicates with Participants, verbally and through statements of account; and
-  processes claims.

*See* SPD at 3, 5, 7, 11, 29, 33; Participant Fee Disclosure at 1

189.  Thus, the services provided by Fidelity were nothing out of the ordinary. A prudent fiduciary would have observed the excessive fees being paid to

78

the recordkeeper and taken corrective action. Defendants' failures to monitor and control both recordkeeping and other administrative expenses cost the Plans millions of dollars during the Class Period and constituted separate and independent breaches of the duties of loyalty and prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Corporate Defendants and Committee Defendants)**

190.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

191.   At all relevant times, the Corporate Defendants and Committee Defendants (collectively, the "Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plans' assets.

192.   As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

193.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of the Plans' participants and beneficiaries. Instead, the Prudence Defendants selected and retained investment options in the Plans despite the high cost and underperformance of those funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans. In addition, the Prudence Defendants failed to investigate separate accounts as an alternative to mutual funds and failed to incorporate collective trusts as an alternative to mutual funds to a reasonable degree, even though these two types of investment vehicles generally provide the same investment management services at a lower cost. Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

194.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars in losses due to excessive costs and lower net investment returns. Had the Prudence Defendants properly discharged their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants and beneficiaries would have had more money available to them for their retirement.

195.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

196.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Corporate Defendants and the Board Defendants)

197.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

198.   The Corporate Defendants and the Board Defendants (collectively, the "Monitoring Defendants") had the authority to appoint and remove members of the Committees, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

81

199.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

200.   The Monitoring Defendants also had a duty to (i) ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); (ii) had adequate financial resources and information; (iii) maintained adequate records of the information on which they based their decisions and analyses with respect to the Plans' investments; and (iv) reported regularly to the Monitoring Defendants.

201.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

   (a)   Failing either to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

   (b)   Failing to monitor the processes by which the Plans' investments were evaluated, their failure to investigate the availability of lower-cost share classes, their failure to investigate and utilize the availability of lower-cost separate account and collective trust vehicles, and their failure to obtain lower-cost recordkeeping services; and

(c)     Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, and caused the Plans to pay excessive recordkeeping fees, all to the detriment of the Plans and Plans' participants' retirement savings.

202.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

203.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets and excessive administrative expenses, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: October 30, 2020          By:  */s/ David H. Fink*
                                       David H. Fink (P28235)
                                       Nathan J. Fink (P75185)
                                       **FINK BRESSACK**
                                       38500 Woodward Ave., Suite 350
                                       Bloomfield Hills, MI 48304
                                       Phone: (248) 971-2500
                                       dfink@finkbressack.com
                                       nfink@finkbressack.com

                                       Eric Lechtzin (Federal Bar I.D. # 62096PA)
                                       Marc H. Edelson
                                       **EDELSON LECHTZIN LLP**
                                       3 Terry Drive, Suite 205
                                       Newtown, PA 18940
                                       Telephone: (215) 867-2399
                                       Facsimile: (267) 685-0676
                                       elechtzin@edelson-law.com
                                       medelson@edelson-law.com

                                       *Counsel for Plaintiffs and the*
                                       *Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2020, I electronically filed the foregoing paper with the Clerk of the court using the ECF system, which will send notification of such filing to all counsel of record registered for electronic filing.

**FINK BRESSACK**

By: /s/ Nathan J. Fink
Nathan J. Fink (P75185)
38500 Woodward Ave, Suite 350
Bloomfield Hills, MI  48304
(248) 971-2500
nfink@finkbressack.com